UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

FLORENCE MENDEZ,

               Plaintiff,

vs.                        Case No.  2:12-cv-158-FtM-29UAM

LAND INVESTORS, CORP.,  a Florida
Corporation,

               Defendant.
_____

## <u>OPINION AND ORDER</u>

The matter is before the Court on plaintiff's four (4) count Complaint (Doc. #1) against defendant asserting violation of the Interstate Land Sales Full Disclosure Act (ILSFDA) (Count I) and state law claims for fraudulent misrepresentation (Count II), negligent misrepresentation (Count III), and false information negligently supplied for the guidance of others (Count IV).  The Court conducted a bench trial, and the parties thereafter each submitted a post-trial memorandum (Docs. ## 75, 76, 77).  The Court will address the federal ILSFDA claim first, and then the three fraud related state law claims.

## I.  Interstate Land Sales Full Disclosure Act (ILSFDA) Claim

The Court makes the following findings of facts and conclusions of law related to plaintiff's ILSFDA claim:

## A.  Land Investors Corporation

Defendant Land Investors Corp. (defendant or Land Investors) is a Florida corporation whose primary business is real estate

investment in Southwest Florida. These investments typically involved the purchase of vacant lots, which were resold to the public in Europe for a profit to Land Investors. At all relevant times, Jean-Claude Giger (Giger) was president of Land Investors.

The Port Charlotte Subdivision is a series of platted lots located in Charlotte County, Florida. It was originally developed in 1959 by General Development Corporation and consisted of approximately 113,000 platted lots. On various dates from January 2008 through October 2012, Land Investors acquired and then re-sold lots within the Port Charlotte Subdivision. Between these dates, Land Investors bought a total of 535 lots, re-selling most of them (519 lots) to investors in France.

Land Investors also owned Florida real property outside the Port Charlotte Subdivision, which was bought and sold in a similar manner.

**B.  Sales of Port Charlotte Subdivision Lots in France**

Land Investors sold vacant lots in the Port Charlotte Subdivision to persons or entities in France through referrals from independent real estate/investment agents who would receive a commission upon the sale of a lot. During the relevant time period, Giger represented Land Investors in France and supervised the sale of the Land Investors' lots through over forty such independent agents. These agents included Armand Aznavourian (Aznavourian) and Guy Zimmer (Zimmer), each of whom was an agent of

Land Investors for the transactions in which each was involved. Charles Astouric (Astouric) served as the attorney/advisor for Land Investors in connection with the lot sales to plaintiff.

There is no evidence of any advertizing or sales promotions by Land Investors to the general public, either in the United States or in France. The description of the sales process in France comes largely from the testimony of Aznavourian and some stipulated facts. Aznavourian testified at trial that he has been a real estate broker in France for approximately twenty years. In 2008 and 2009, he was an independent broker working on a commission basis. From January 2008 through March 2009, Aznavourian sold over eighty Port Charlotte Subdivision lots owned by Land Investors to persons residing in France. Joint Exhibit 10. In all, Aznavourian sold 170 lots and Zimmer sold 62 lots in the Port Charlotte Subdivision. (See Doc. #75, pp. 10, n.13, 15 for record citations.)

The parties stipulated that Land Investors would provide lists of the properties in its portfolio to real estate brokers in Europe. These brokers would receive a commission upon the sale of a lot by Land Investors. Aznavourian described the marketing and sales process in France as follows: Giger would manage the sales activities from his office in France, and controlled which particular lots were made available for sale. From time to time, Giger would provide a list of 12 to 15 Port Charlotte Subdivision

lots owned by Land Investors which could be sold.  Typically, when nearly all of the lots on one list were sold, Land Investors would purchase new lots in the subdivision and Giger would provide Aznavourian with a new list.  Once Aznavourian had the list, it was up to him to find people to purchase the properties.  To help find purchasers, Aznavourian would use property management advisors whose companies advertised in the phone book and who had clients who may be interested in purchasing the properties.  Aznavourian would provide the lists of available lots to such property advisors.  The price for each lot was set by Land Investors and was contained on the inventory lists provided by Giger.  The lots were sold pursuant to a form sales contracts printed in Miami, Florida. The money paid by the purchaser was payable to Land Investors, and Giger would send the signed contract and money to Florida, where it was processed.  A title company would issue a deed and a title insurance policy.  Giger controlled the entire process in France, including whether to accept a reduced sale price.

## C.  Florence Mendez Transactions

While some factual details of the lot sales to plaintiff Florence Mendez (plaintiff or Mendez) are disputed, certain basic facts are clearly established.  After selling inherited real property in 2009 for 215,000 Euros (approximately $279,000), Mendez decided to invest the money in anticipation of retirement.  Mendez asked her real estate agent how to buy property abroad, and was

told to look in the yellow pages of the phone book and contact an investment agency.   In about March 2009, plaintiff did so, ultimately speaking with Zimmer.   Mendez eventually purchased a total of ten vacant lots in the Port Charlotte Subdivision.   The first five lots were by separate contracts signed on March 17, 2009; the next five lots were by a single contract signed on April 15, 2009, which was followed up by five separate contracts signed by Mendez on April 16, 2009.   Joint Exhibit 10, Tabs 92-96.   The parties stipulated to the substance of the information set forth in the chart below.

| Property Address | Land Investors Purchase Date | Land Investors Purchase Price | Mendez Purchase Contract Date | Mendez Purchase Price |
|---|---|---|---|---|
| 3477 Yarrow St | 1/1/09 | $30,000 (for 4 lots, $7,500 average) | 3/17/09 | $26,900 |
| 4389 McLean St | 12/19/08 | $22,000 (for 4 lots, $5,500 average) | 3/17/09 | $26,900 |
| 12204 Kelley Ave | 11/1/08 | $7,900 | 3/17/09 | $26,900 |
| 12100 Grady Ave | 6/10/08 | $76,000 (for 8 lots, $9,500 average) | 3/17/09 | $26,900 |
| 12068 Karney Ave | 4/21/08 | $8,500 | 3/17/09 | $26,900 |
| 4567 Opel Ter | 4/13/09 | $41,300 (for 6 lots, $6,883 average) | 4/15/09 | $124,000 for this and four lots below, $24,800 average |

| 12442 Mayer Ter | 4/13/09 | $41,300 (for 6 lots, $6,883 average) | 4/15/09 | $24,800 average |
| 12419 Hathaway Ter | 4/13/09 | $41,300 (for 6 lots, $6,883 average) | 4/15/09 | $24,800 average |
| 12356 Hathaway Ter | 4/13/09 | $41,300 (for 6 lots,$6,883 average) | 4/15/09 | $24,800 average |
| 4177 Pilgrim St | 10/22/08 | $29,000 (for 4 lots,$6,883 average) | 4/15/09 | $24,800 average |

Joint Exhibits 1, 2.

The individual Contracts for Sale and Purchase, Joint Exhibit 2-A through E, for the first five lots were signed on March 17, 2009, by Mendez as buyer and Aznavourian as the authorized agent of Land Investors.  These Contracts provided in part: "THIS IS A CONTRACT BY WHICH YOU AGREE TO PURCHASE LAND.  YOU HAVE 10 DAYS IN WHICH TO DETERMINE WHETHER TO CONTINUE THIS CONTRACT OR CANCEL IT WITH FULL REFUND."  The next five lots were purchased pursuant to a single Purchase and Sale Agreement, Joint Exhibit 2-F-1 and F-2.  This contract, signed by Mendez and by Zimmer as the authorized agent of Land Investors, contained the same ten-day cancellation language, also in all capital letters.  On April 16, 2009, Mendez and Zimmer executed five separate contracts for these lots, each containing the ten day cancellation language.  Joint Exhibit 10, Tabs 92-96.

Plaintiff has paid all monies due under the contracts, consisting of 196,800 Euros.  In or about May and June 2009, plaintiff obtained title to the ten (10) lots by warranty deed.  In August 2009, Mendez spoke with Aznavourian, asking if she could back out and get her money back.  This was refused.

**D.  Interstate Land Sales Full Disclosure Act (ILSFDA)**

The ILSFDA is a consumer protection statute intended to "curb abuses accompanying interstate land sales." Stein v. Paradigm Mirasol, LLC, 586 F.3d 849, 853 (11th Cir. 2009) (quoting Winter v. Hollingsworth Props., Inc., 777 F.2d 1444, 1447 (11th Cir. 1985). The ILSFDA makes it unlawful for "any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails" with respect to the sale or lease of any lot without complying with the Act.  15 U.S.C. § 1703(a).  As relevant to this case, the ILSFDA requires certain developers of subdivisions to register their projects with the Secretary of Housing and Urban Development and file a statement of record containing certain information prior to selling a non-exempt lot.  15 U.S.C. §§ 1703(a)(1)(A), 1704-06.  Additionally, a developer may not sell or lease a non-exempt lot "unless a printed property report, meeting the requirements of section 1707 of this title, has been furnished to the purchaser or lessee in advance of the signing of any contract or agreement by such purchaser or lessee." 15 U.S.C. §§

1703(a)(1)(B), 1707.  If a property report has not been furnished to the buyer before executing the contract for sale, "such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing, and such contract or agreement shall clearly provide this right." 15 U.S.C. § 1703(c).  Further, the ILSFDA includes certain anti-fraud provisions which make it unlawful for a developer to intentionally deceive purchasers.  15 U.S.C. § 1703(a)(2).  Finally, the ILSFDA also includes a list of exemptions from some or all of its requirements.  15 U.S.C. § 1702.

**E.   Count I: ILSFDA Claim**

Count One of the Complaint (Doc. #1) alleges that Land Investors was a "developer" of a "subdivision" as those terms are defined in the ILSFDA; that as of the dates of the ten contracts, there was no statement of record regarding the lots on file with the Secretary of Housing and Urban Development; that plaintiff was not provided a property report regarding the lots; and that Land Investors never advised plaintiff that the contracts were subject to revocation or subject to regulation of any kind.  Plaintiff seeks to recover the money paid for the lots, as well as compensatory damages, interest, equitable relief, attorney fees, and costs pursuant to §§ 1703 and 1709(c) of the ILSFDA.

Land Investors concedes that: (1) There was no statement of record filed by Land Investors with the Secretary of Housing and

Urban Development regarding the lots sold to Mendez; (2) Land Investors did not furnish Mendez a printed property report meeting the requirements of 15 U.S.C. § 1701 in advance of the signing of the contracts to purchase any of the ten lots; (3) Mendez was not advised that the contracts may be revoked at her option within two years of the date of signing prior to signing the contracts; and (4) None of the contracts provided that the contracts may be revoked at plaintiff's option within two years of the date of signing.  Joint Exhibits 5, 6, ¶¶ 19-24; Doc. #43, p. 8, ¶¶ 15-17. Defendant asserts, however, that the ILSFDA does not apply to these sales because there is no evidence of the use of interstate commerce and Land Investors was not a "developer" within the meaning of the ILSFDA.  Alternatively, defendant asserts various affirmative defenses which would exempt it from compliance with the ILSFDA or bar plaintiff's claim.

**(1) Interstate Commerce Was Used**

Land Investors first argues that the ILSFDA does not apply because "Defendant did not use communications or advertising in interstate commerce to solicit potential buyers."  (Doc. #76, p. 6.)  The reach of the ILSFDA, however, is not so limited.

Generally, the ILSFDA makes it unlawful for "any developer or agent, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails" with respect to the sale or lease of any

lot without complying with the Act.  15 U.S.C. § 1703(a).
"Interstate commerce" is a defined term under the ILSFDA which
means "trade or commerce among the several States or between any
foreign country and any State."  15 U.S.C. § 1701(8).  The statute
does not govern simply interstate solicitations of potential
buyers, and there is no indication that the ILSFDA was intended
only to apply to the solicitation of potential buyers.  Rather, the
statute applies to all conduct by a developer or agent "with
respect to" the sale or lease of any non-exempt lot.  15 U.S.C. §
1703(a).  "[W]ith respect to" commonly is defined as "concerning."
Garcia v. Federal Ins. Co., 969 So. 2d 288, 291-92 (Fla. 2007).

The Court finds that plaintiff has established that Land
Investors made use of interstate commerce with respect to the sales
of the lots to Mendez.  The transactions involved real property in
Florida, owned by a Florida corporation, and sold to a citizen of
France who resided in France and had never traveled to the United
States.  The contract forms were created and processed in Florida,
the purchase money was ultimately sent from France to Florida, and
a Florida title company issued titles and insurance for the
properties, which were provided to Mendez in France.  The Court is
satisfied that the circumstances establish use of interstate
commerce with respect to the lot sales.  Therefore, the ILSFDA
applies to the transactions if the other requirements are
satisfied.

-10-

### (2)  Land Investors Was A "Developer"

Both parties agree that the § 1703(a)(1)(B) property report requirement only applies to a "developer."  Thus, unless Land Investors was a "developer" at the time of the transactions with Mendez, the ILSFDA would not require that Mendez be furnished a property report by Land Investors or its agents.

The ILSFDA defines "developer" as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision."  15 U.S.C. § 1701(5).  The credible evidence establishes that Land Investors clearly meets the first three elements of the "developer" definition.  The evidence established beyond any doubt that Land Investors is (1) a "person"[1] who (2) directly or indirectly sold and offered to sell (3) lots.  The issue becomes whether those lots were "in a subdivision."

A "subdivision" is defined as "any land which is located in any State or in a foreign country and is divided or is proposed to be divided into lots, whether contiguous or not, for the purpose of sale or lease as part of a common promotional plan."  15 U.S.C. § 1701(3).  The evidence established without doubt that the lots sold by Land Investors to Mendez met the first three elements of the definition of a "subdivision."  The real properties sold were (1)

---

[1]"[P]erson means an individual, or an unincorporated organization, partnership, association, corporation, trust or estate."  15 U.S.C. § 1701(2).

land located in a State (Florida) which (2) were divided into lots (3) for the purpose of sale.  In the final analysis, whether Land Investors was a "developer" in this case turns on whether the sales were part of a "common promotional plan" within the meaning of the statute.

A "common promotional plan" means "a plan, undertaken by a single developer or a group of developers acting in concert, to offer lots for sale or lease."  15 U.S.C. § 1701(4).[2]  The ILSFDA is not limited to the original developer of a subdivision, but can apply to a person who purchases an inventory of lots in a subdivision and re-sells the lots.  U.S. Dep't of Housing & Urban Dev. v. Cost Control Mktg. & Sales Mgmt. of Va., Inc., 64 F.3d 920, 925 (4th Cir. 1995); Olsen v. Lake Country, Inc., 955 F.2d 203, 205 (4th Cir. 1991).  On the other hand, incidental and occasional lot sales will not fall within the ambit of the ILSFDA.  Cumberland Capital Corp. v. Harris, 621 F.2d 246, 250-51 (6th Cir. 1980).  Regulations promulgated by the Department of Housing and Urban Development (HUD) provide guidance on the concept of "common promotional plan":

---

[2]Although not applicable here, "where such land is offered for sale by such a developer or group of developers acting in concert, and such land is contiguous or is known, designated, or advertised as a common unit or by a common name, such land shall be presumed, without regard to the number of lots covered by each individual offering, as being offered for sale or lease as part of a common promotional plan."  15 U.S.C. § 1701(4).

> [C]haracteristics that are evaluated in determining whether or not a common promotional plan exists include, but are not limited to: a 10% or greater common ownership; same or similar name or identity; common sales agents; common sales facilities; common advertising; and common inventory. The presence of one or more of the characteristics does not necessarily denote a common promotional plan. Conversely, the absence of a characteristic does not demonstrate that there is no common promotional plan.
>
> Two essential elements of a common promotional plan are a thread of common ownership or developers acting in concert. However, common ownership alone would not constitute a common promotional plan. HUD considers the involvement of all principals holding a 10 percent or greater interest in the subdivision to determine whether there is a thread of common ownership. If there is common ownership or if the developers are acting in concert, and there is common advertising, sales agents, or sales office, a common promotional plan is presumed to exist.

24 C.F.R. § 1710, Supp. II(b).[3]

The Court finds that the credible evidence established that the lots were sold to Mendez as part of a common promotional plan, and Land Investors was therefore a "developer" and governed by the ILSFDA as to the sales to Mendez. Land Investors had a plan implemented by Giger pursuant to which it sold more than 500 lots in the Port Charlotte Subdivision over a four year period. The

---

[3] HUD Guidelines, available at: http://www.hud.gov/offices/hsg/ramh/ils/ilsexemp.cfm. The Guidelines state that they are intended to clarify HUD polices and positions with regard to the statutory exemptions, and that they are an interpretive rule and not a substantive regulation. 61 Fed. Reg. 13596, 13601 (1996). As an interpretive agency rule, the Guidelines are entitled to some deference, Reno v. Koray, 515 U.S. 50, 59 (1995), but not Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), deference. Dolphin LLC v. WCI Cmtys., Inc., 715 F.3d 1243, 1248-49 (11th Cir. 2013).

plan consisted of Giger selecting, purchasing, and pricing lots in the Port Charlotte Subdivision, and utilizing independent real estate professionals in France to market the lots in France. These independent real estate professionals were agents of Land Investors.[4]  Land Investors would periodically buy groups of lots in the Port Charlotte Subdivision for the purpose of re-selling them at a profit.  In about four years, Land Investors bought 535 lots and re-sold 519 lots to investors in France utilizing the same procedure and standardized contracts.  The Court finds that Land Investors was a developer of a subdivision, and that the ILSFDA applied to the Mendez transactions.

### (3)  Affirmative Defenses

Land Investors raises two distinct affirmative defenses. First, Land Investors asserts that if it was a "developer," it was exempt under both the "25 lot exemption" and the "99 lot exemption."[5]  The burden of establishing the applicability of either exemption is upon Land Investors.  <u>Gentry v. Harborage</u>

---

[4]An "agent" is "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot of lots in a subdivision[.]"  15 U.S.C. § 1701(6).

[5]Actually, defendant does not raise the 99 lot exemption as an affirmative defense in its Answer And Affirmative Defenses (Doc. #13, pp. 4-5), or in the Joint Final Pretrial Statement (Doc. #43, p. 5).  The Court denied defendant's request to file amended affirmative defenses to raise the 99 lot exemption.  (Doc. #39.) Defendant raises the issue in Proposed Findings of Fact and Conclusions of Law (Doc. #40) and its Post-Trial Brief (Doc. #76, pp. 9-10).

Cottages-Stuart, LLLP, 654 F.3d 1247, 1258-59 (11th Cir. 2011).
Second, Land Investors asserts that Count I is barred by the
applicable statutes of limitations.  Again, the burden of proof is
upon Land Investors.  Tello v. Dean Witter Reynolds, Inc., 410 F.3d
1275, 1292 (11th Cir. 2005) (citations omitted).

   **(a)  Exemptions from ILSFDA**

   Two distinct exemptions are at issue.  First, "[u]nless the
method of disposition is adopted for the purpose of evasion of" the
ILSFDA, the ILSFDA does not apply to the sale of "lots in a
subdivision containing less than twenty-five lots."  15 U.S.C. §
1702(a)(1).  This 25-lot exemption is a full exemption, making all
provisions of the ILSFDA inapplicable to sales of lots within such
a subdivision.  Pugliese v. Pukka Dev., Inc., 550 F.3d 1299, 1301
(11th Cir. 2008).  Second, "[u]nless the method of disposition is
adopted for the purpose of evasion of" the ILSFDA, the registration
and disclosure requirements of the Act do not apply to the sale of
"lots in a subdivision containing fewer than 100 lots which are not
exempt under subsection (a) of this section [§1702(a)]."  15 U.S.C.
§ 1702(b)(1).

   Land Investors asserts that on the date of the first sales to
Mendez, it owned 25 lots within the Port Charlotte Subdivision, and
at the time of the sales of the remaining five lots to Mendez, it
owned 16 lots in the Port Charlotte Subdivision.  (Doc. #76, p. 9.)
Land Investors does not count any lot sold prior to the Mendez

transactions as being "lots in a subdivision."  Mendez responds that neither the "25 lot exemption" nor the "99 lot exemption" are applicable because Land Investors's "common promotional plan" involved over 100 lots.  Mendez argues that the number of lots in the subdivision includes those lots sold prior to her transactions, those lots sold to her, and those lots contemplated to be sold by Land Investors in the future.

The time for determining whether the sale of a particular lot is entitled to one of the statutory exemptions is the date the buyer signs the contract to purchase the lot.  Bodansky v. Fifth on the Park Condo, LLC, 635 F.3d 75, 83, 85 (2d Cir. 2011).  See also Winter, 777 F.2d at 1449; Nickell v. Beau View of Biloxi, LLC, 636 F.3d 752, 756 (5th Cir. 2011); Grove Towers, Inc. v. Lopez, 467 So. 2d 358, 360-61 (Fla. 3d DCA 1985).  The first five contracts were signed on March 17, 2009, and the contract as to the last five lots was signed on April 15, 2009, with individual contracts for the last five lots being signed on April 16, 2009.

Plaintiff makes no allegations that defendant's actions lack a legitimate business purpose, and there is no evidence to suggest that defendant's business plan was adopted to evade the requirements of the ILSFDA.  Therefore the "unless" provision of the exemptions are not at issue in this case.

### (i) 25 Lot Exemption

Land Investors asserts, and the evidence supports, that on March 17, 2009, it owned 25 lots within the Port Charlotte Subdivision. (Doc. #76, p. 9.) Since this exemption requires a subdivision with "less than" 25 lots, 15 U.S.C. § 1702(a)(1), the exemption does not apply to the first five lots sold to Mendez. The Court rejects Land Investors' argument that the only lots arguably part of a common plan were the ten lots sold to Mendez. The credible evidence established that all of the lots were part of a common promotional plan.

Land Investors asserts that on April 15, 2009, it owned 16 lots in the Port Charlotte Subdivision. (Doc. #76, p. 9.) While that appears to be correct, the statute refers to a subdivision "containing" less than 25 or 100 lots respectively, not to the number of lots in the subdivision which are still owned by the developer. The Land Investors "subdivision" consisted of far more than just the lots it then owned. The evidence established that Land Investors executed contracts to sell eighty-two (82) lots in its subdivision prior to its first sales to Mendez. Joint Exhibit 10, Tabs 1 through 82. On March 17, 2009, Land Investors sold five lots to Mendez. Joint Exhibit 10, Tabs 83-87. Four additional lots were then sold to other persons. Joint Exhibit 10, Tabs 88-91. The second five lots were then sold to Mendez on April 15 and 16, 2009. Joint Exhibit 10, Tabs 92-96. Then, between April 20,

2009, and December 2012, Land Investors sold an additional 438 lots to others.  Thus, as of March 17, 2009, Land Investors had sold at least 82 lots in its subdivision, not counting the lots to Mendez. As of April 15, 2009, Land Investors had sold at least 91 lots in its subdivision, not counting the new lots to Mendez.  Accordingly, the 25 lot exception does not apply to the sales of the lots to Mendez on either March 17, 2009, or on April 15, 2009.

### (ii) 99 Lot Exemption

The ILSFDA registration and disclosure requirements of the Act do not apply to the sale of "lots in a subdivision containing fewer than 100 lots which are not exempt under subsection (a) of this section [§1702(a)]."  15 U.S.C. § 1702(b)(1).  As discussed above, Land Investors had sold 82 lots in its subdivision prior to any sales to Mendez.  On March 17, 2009, Land Investors owned an additional 25 lots which were then unsold.  Thus, the subdivision contained 107 lots, more than the threshold 100 lots under the exemption.

This alone is not sufficient, however, because unlike the 25 lot exception, the Court can only count those lots not exempt under any of the eight exemptions in § 1702(a) in determining if the 100 lot threshold was satisfied.  There is no evidence that any of the lots sold by Land Investors prior to the Mendez sales fell within any of the § 1702(a) exemptions.  The only possibility seems to be § 1702(a)(2), which exempts sales of land under a contract

obligating the seller to erect a building within two years.  None of the sales contracts entered in evidence in this case contain such a contractual obligation.  Therefore, as of March 17, 2009, the Land Investor subdivision contained 107 non-exempt lots (82 sold plus 25 owned by Land Investors).  On April 15, 2009, the Land Investor subdivision contained 107 non-exempt lots (82 sold, plus 5 sold to Mendez, plus 4 sold to others, plus 16 owned by Land Investors).  Accordingly, the 100 lot exception does not apply to the sales of the lots to Mendez on either March 17, 2009, or on April 15, 2009.

**(b)   Statute of Limitations**

Land Investors' second affirmative defense alleges that plaintiff's ILSFDA claim is time-barred.  (Doc. #13, pp. 4-5.)  Two statutes of limitations are at issue.  First, the ILSFDA provides a two-year statute of limitations for rescission of a contract to buy property if a property report was required but not provided prior to the signing of the contract to purchase the property.

> In the case of any contract or agreement for the sale or lease of a lot for which a property report is required by this chapter and the property report has not been given to the purchaser or lessee in advance of his or her signing such contract or agreement, such contract or agreement may be revoked at the option of the purchaser or lessee within two years from the date of such signing, and such contract or agreement shall clearly provide this right.

15 U.S.C. § 1703(c).  Second, the ILSFDA provides a three-year statute of limitations for monetary damages and equitable relief

-19-

for violations of its various sections.  15 U.S.C. § 1711(a)-(b).
"Courts uniformly hold that the Act's limitations period begins to
run when an initial sales contract is signed." <u>Orsi v. Kirkwood</u>,
999 F.2d 86, 89 (4th Cir. 1993).  The contracts at issue were
signed March 17, 2009, and April 15 and 16, 2009.

While Mendez made inquiries about backing out of the contracts
in July 2009, the parties have stipulated that "Plaintiff did not
exercise her right to automatically revoke the purchase contracts
within two years of signing the contracts." (Doc. #43, p. 9, ¶
22.)  Accordingly, Mendez cannot revoke any of the contracts
pursuant to § 1703(c), <u>Princeton Homes, Inc. v. Virone</u>, 612 F.3d
1324, 1328 n.1 (11th Cir. 2010), and to that extent, the Land
Investors' affirmative defense is upheld.

Mendez may recover for a violation of § 1703(a) in law or
equity, 15 U.S.C. § 1709(a), and the statute of limitations for
such actions is three years, 15 U.S.C. § 1711.  Thus, even though
Mendez may not revoke the contracts pursuant to § 1703(c) because
the Complaint was filed more than two years after she executed all
of the contracts, damages and equitable relief may be available for
violation of § 1703(a) pursuant to § 1709(a) because the Complaint
was filed within three years of signing the purchase contracts.
<u>Princeton Homes</u>, 612 F.3d at 1328 n.1; <u>Gentry</u>, 654 F.3d at 1262
("Even though Plaintiffs are not entitled to the automatic
statutory revocation remedies provided in 15 U.S.C. § 1703(c)

because they did not attempt to revoke their contracts within two years from the date of signing the purchase contracts, they may still be entitled to the return of their deposits as equitable relief under § 1709."). Accordingly, the Court finds that Mendez's claim for equitable relief pursuant to 15 U.S.C. § 1709 is not time-barred.

**(4)  Relief**

Both legal and equitable relief are available for a violation of § 1703(a), and "the court may order damages, specific performance, or such other relief as the court deems fair, just, and equitable." Princeton Homes, Inc., 612 F.3d at 1328 (quoting 15 U.S.C. § 1709(a)).  Land Investors failed to register its subdivision or file a statement of record; it failed to provide Mendez with a printed property report for any lot; and it failed to inform Mendez either verbally or in the contracts of her right to revoke the contracts within two years.  The evidence clearly established that Mendez did not know of her right to revoke the contracts within the two year statute of limitations period, and that if Mendez had known she would have revoked all ten of the contracts (as she tried to do in July 2009).  The Court finds that Mendez is entitled to rescission of the ten contracts, the return of the purchase monies she paid for the ten lots, and prejudgment interest as of the dates of her final payments. Gentry, 654 F.3d at 1261-62.  The rate of the prejudgment interest is a matter of

federal law and is left to the discretion of the district court. Nahigian v. Juno-Loudoun, LLC, 677 F.3d 579, 592 (4th Cir. 2012). In order to obtain such damages, Mendez must re-convey clear title to the lots back to Land Investors.

Mendez paid a total of 196,800 Euros for the ten lots (800 Euros on March 17, 2009; 98,000 Euros on April 9, 2009; and 98,000 Euros on April 17, 2009), and based on the then-existing exchange rates seeks $255,288 plus prejudgment interest. (Doc. #77-1.) The Court will award this amount. Prejudgment interest will be calculated utilizing the commonly-used IRS underpayment rate. See 26 U.S.C. § 6621(a)(2) (defining the IRS underpayment rate as the Federal Reserve short-term interest rate plus three percentage points). SEC v. Lauer, 478 F. App'x 550, 557-58 (11th Cir. 2012) (citing cases approving this rate as a reasonable approximation for fraud cases). On September 30, 2013, the Internal Revenue Service issued its Revenue Ruling for the fourth quarter of 2013, including the underpayment rates from January 1, 1999 to December 31, 2013. Rev. Rul. 2013-16. The calculations are as follows:

| Period | Days | Daily Rate | Principal | Total |
|---|---|---|---|---|
| 4/15/2009 to 12/31/2010 | 625 | 0.000109589 | $255,288.00 | $17,485.48 |
| 1/1/2011 to 3/31/2011 | 89 | 0.0000821918 | $255,288.00 | $1,867.45 |
| 4/1/2011 to 9/30/2011 | 182 | 0.000109589 | $255,288.00 | $5,091.77 |

| 10/1/2011 to 1/7/2014 | 829 | 0.0000821918 | $255,288.00 | $17,394.55 |
|---|---|---|---|---|
| **Prejudgment Total** | | | | **$41,839.26** |

Plaintiff also seeks to recover attorney fees and costs pursuant to 15 U.S.C. § 1709(c).  The amount recoverable under the ILSFDA may include court costs and reasonable amounts for attorneys' fees. 15 U.S.C. § 1709(c). A district court's award of costs and attorneys' fees under the ILSFDA is discretionary. Berlin v. Renaissance Rental Partners, LLC, 723 F.3d 119, 128 (2d Cir. 2013).   Under the circumstances, the Court will award plaintiff reasonable attorneys' fees and costs.

## II.  Fraud-Related Claims

There are three state law fraud-related claims: Count II alleges a claim for fraudulent misrepresentation; Count III alleges a claim for negligent misrepresentation; and Count IV alleges a claim for false information negligently supplied for the guidance of others.  Each count alleges that agents of Land Investors made the same false representations to Mendez concerning the ten lots she purchased: "(1) that the value of the lots offered to plaintiff would double or triple in value within three years of the date of purchase from defendant; (2) that the lots offered to plaintiff were much better investments than the rental income property sought by plaintiff; (3) that there was a shortage of lots such as those

offered to plaintiff; and (4) that plaintiff needed to act immediately in order to profit from the lots offered by defendant." (Doc. #1, ¶¶ 23, 32 41; Doc. #43, p. 3.)

## A.  Additional Facts Relevant to Fraud Related Claims

The Court finds the credible evidence establishes the following additional facts:

Plaintiff is a 48 or 58 year old (the testimony and other evidence is conflicting as to plaintiff's age) citizen of the Republic of France who lives alone in Marseilles, France, and had never been to the United States prior to her appearance in the trial of this case.  She had no prior dealings or business in Florida, and has a limited educational and work experience background.  Since approximately 2008, she has been receiving a pension of between 760 to 780 Euros per month (approximately $1,000) from the French government due to disabilities akin to Tourette Syndrome, compulsive behavior, attention deficit disorder, and other mental issues which impact her comprehension.  Plaintiff had no other income.  Her medical conditions do not affect her ability to read and write French, but she has never had a driver's license.

Mendez received a small apartment building as an inheritance when her aunt passed away, and in 2009, Mendez sold the downstairs apartment for 215,000 Euros (approximately $279,000).  Plaintiff retained ownership of and lived in a small, modest apartment

upstairs.  Plaintiff decided to invest the money, but asserts she did not understand that there is risk associated with investment. Plaintiff testified that as a general matter, she believed she was guaranteed to make money on any investment.  This understanding, of course, was simply not accurate.

Plaintiff began thinking about retirement, and initially thought about buying two or three small rental houses in Austria for retirement income.  Mendez asked her real estate agent how to buy property abroad, and was told to look in the yellow pages of a phone book and contact an investment agency.

In about March 2009, plaintiff looked in the yellow pages, and called a company (Gestion Patrimonie Investissement) which put her in touch with one of its employees, Guy Zimmer.  Mendez had never met Zimmer before, and knew nothing about him or the company which employed him.  Mendez told Zimmer she wanted to buy little houses abroad in order to obtain rental income.  Zimmer responded that he had something much better, and asked her to come to his office. Mendez said she was unable to do so because she was disabled, so Zimmer agreed to come to her apartment later that day.  Zimmer asked several times if plaintiff had a guardianship, and she responded no.

On March 16, 2009, Zimmer arrived at Mendez's apartment with Aznavourian.  In written answers to interrogatories, plaintiff stated that Zimmer told her that rental property would not be a

good investment, and instead presented Mendez with a wonderful investment in Florida. Zimmer showed Mendez a binder and satellite photographs of vacant land in Charlotte County, Florida, being sold by Land Investors. Mendez stated that Zimmer also showed her charts and materials which projected guaranteed double and triple returns on short-term investments in lots being offered for sale; urged Mendez to purchase quickly because only 1,500 such properties remained; stated Mendez needed to act immediately in order to reserve a place to purchase the lots before they were sold to others; and stated that the lots were popular because people in Miami were retiring and moving there for retirement. Joint Exhibit 4. At trial, Mendez testified that "they" told her she would make more money with lots than with little houses in Austria; that there were 1,500 lots available; that she had to act quickly because lots of other people were waiting to buy the lots; that she would at least double her investment; and that there was no risk of losing money.

Mendez testified she provided Zimmer a check for 1,000 Euros, which represented a 200 Euro deposit on the first five lots. Mendez further testified that she made no effort to investigate the value of the lots before buying them because she felt pressured into buying. Mendez testified that if she had been told the appraised value or the price Land Investors paid for the lots, she would not have bought the lots.

According to Mendez's interrogatory answers, Zimmer returned alone on March 17, 2009, with five Land Investors contracts. Zimmer urged Mendez to sign quickly for the same reasons he had stated before.  Zimmer returned her 1,000 Euro check as a sign of good faith, and said a deposit of 800 Euro would be sufficient. Mendez wrote a check for 800 Euros and signed the five contracts on March 17, 2009.

The next day Mendez began to have second thoughts about the transaction, and contacted Denis Gentilin (Gentilin), an attorney who had represented her in an unrelated matter.  Mendez told Gentilin she needed reassurance that the lots existed, and requested that he investigate that issue.  Mendez set up a meeting with Gentilin, and advised Aznavourian of the meeting.  At Aznavourian's request, Charles Astouric drove Mendez to Gentilin's office.  In due course, Gentilin determined that the lots did in fact exist and advised Mendez of that fact.  The Court rejects Mendez's testimony that Gentilin did not so inform her as not credible under all the circumstances.

Mendez stated in her interrogatories that on April 9, 2009, Zimmer returned to her apartment with Aznavourian and Astouric. They took Mendez to a local restaurant and discussed the purchase of more lots.  Aznavourian and Astouric essentially repeated Zimmer's earlier statements, and urged her to pay the amounts due on the contracts she had signed earlier.  Aznavourian stated he

would add a free boat ramp to her lots and pay the property taxes on the lots for three years, and said that Land Investors would resell the lots for her without commission, closing costs, or notary fees.  Astouric was generally quiet, but nodded in agreement.  Mendez paid Zimmer an additional 98,000 Euros that day by check for the balance of the first group of five lots.

Mendez stated in her interrogatory answer that on April 15, 2009, Zimmer, Asnavourian, and Astouric came to her apartment with a contract to purchase five additional lots.  They repeated the same representations and Mendez signed the contract in Zimmer's car, and paid 98,000 Euros for the five additional lots.

The only other witness who testified to these events was Aznavourian.  Aznavourian testified that he participated in the sales of the first five lots to Mendez, for which he received a commission.  Aznavourian confirmed that he went with Zimmer to meet Mendez in her apartment, but said that this was his only meeting with Mendez.  Aznavourian asked Mendez where she obtained the money she would be using for the purchases, and was informed of her inheritance.  Aznavourian testified that Mendez said she was able to purchase ten lots, but that he advised Mendez to purchase only three lots so her entire investment would not be in the lots. Mendez was shown an aerial map of the area and discussed the different kind of lots available (standard, freshwater canal, saltwater canal).  Mendez told Aznavourian she had never been to

Florida.  Aznavourian further testified that he told Mendez that because of the uncertainty of the market due to the sub-prime crisis, she might have to wait until 2013 to make any money on these lots, and then maybe she could make something.  Aznavourian testified that he received a check for the equivalent of $1,000 from Mendez, then cancelled it and asked Zimmer to return it to Mendez.  Aznavourian testified that he refused to do business with Mendez if she was not represented by an agent or attorney. Aznavourian testified that it was only after Mendez received the assistance of Gentilin that he agreed to go ahead with the sales to Mendez.  Zimmer received a finder's fee and Aznavourian received a commission on the sales to Mendez.

## B.  Elements of State Law Claims

### (1)  Count II: Fraudulent Misrepresentation

In order to state a cause of action for fraudulent misrepresentation under Florida law, a plaintiff must prove:  "(1) a false statement concerning a material fact; (2) the representor's knowledge that the representation is false; (3) an intention that the representation induce another to act on it; and (4) consequent injury by the party acting in reliance on the representation." Butler v. Yusem, 44 So. 3d 102, 105 (Fla. 2010).  While reliance is necessary, "[j]ustifiable reliance is not a necessary element of fraudulent misrepresentation."  Id.

-29-

**(2)   Count III: Negligent Misrepresentation**

The elements of a cause of action for negligent misrepresentation are: (1) there was a misrepresentation of material fact; (2) the representor either knew of the misrepresentation, made the misrepresentation without knowledge of its truth or falsity, or should have known the representation was false; (3) the representor intended to induce another to act on the misrepresentation; and (4) injury resulted to a party acting in justifiable reliance upon the misrepresentation. Coral Gables Distrib. v. Milich, 992 So. 2d 302, 303 (Fla. 3d DCA 2008); Tiara Condominium Ass'n v. Marsh & McLennan Cos., 607 F.3d 742, 747 (11th Cir. 2010). Unlike fraudulent misrepresentation, a misrepresenter is liable only if the recipient of the information justifiably relied on the erroneous information. Gilchrist Timber Co. v. ITT Rayonier, 696 So. 2d 334, 337 (Fla. 1997). Justifiable reliance, however, is not the same thing as the failure to exercise due diligence. Butler, 44 So. 3d at 105.

**(3)   Count IV: False Information Negligently Supplied**

Florida recognizes a civil action for false information negligently supplied for the guidance of others. Gilchrist Timber Co., 696 So. 2d at 335; Morgan v. W.R. Crace & Co., 779 So. 2d 503, 506 (Fla. 2d DCA 2000). This cause of action requires plaintiff to prove the following elements: (1) defendant supplied false information in the course of defendant's business, profession,

employment, or in any transaction in which defendant had an economic interest; (2) defendant was negligent in obtaining or communicating the false information; (3) plaintiff was a person for whose benefit and guidance defendant intended to supply the false information for use in plaintiff's business transaction; (4) defendant intended the false information to influence plaintiff in the business transaction; (5) plaintiff justifiably relied on the false information; and (6) the false information was a legal cause of loss, injury or damage to plaintiff.   In re Standard Jury Instructions in Civil Cases - Report No. 12-01, ___ So. 3d ___, 2013 WL 2349287 (Fla. 2013).

C.  **Application To Mendez Case**

All three state law claims require a false statement of material fact to have been made to Mendez.  Mendez relies upon the same statements to support all three counts:  (1) that the value of the lots offered to plaintiff would double or triple in value within three years of the date of purchase from defendant; (2) that the lots offered to plaintiff were much better investments than the rental income property sought by plaintiff; (3) that there was a shortage of lots such as those offered to plaintiff; and (4) that plaintiff needed to act immediately in order to profit from the lots offered by defendant.

The credible evidence convinces the Court that Land Investors, acting through its agents Zimmer and Aznavourian, made each of the

four representations to Mendez in connection with the sale of the ten lots.

Plaintiff must also prove that one or more of the representations was materially false.  The requirement of a false statement concerning a material fact generally requires that the false statement is about a past or existing fact, not merely an opinion.  Azar v. National City Bank, 382 F. App'x 880, 884 (11th Cir. 2010) (citing Mejia v. Jurich, 781 So. 2d 1175, 1177 (Fla. 3d DCA 2001)).  An exception to this rule applies, however, "[w]here the person expressing the opinion is one having superior knowledge of the subject of the statement and . . . knew or should have known from facts in his or her possession that the statement was false."  Mejia, 781 So. 2d at 1177.  Under those circumstances, "the opinion may be treated as a statement of fact."  Id.

The Court finds that under the circumstances of this case, the first two statements are treated as statements of fact, and the evidence established that they were both material and false.  Both Zimmer and Aznavourian clearly had, and purported to have, superior knowledge as to the value and investment potential of the lots.  As discussed below, each knew or should have known that the representations were false.

The Court finds that the third and fourth statements do not qualify as material false statements.  There has been no showing that there was or was not a shortage of lots "such as those offered

to plaintiff." Additionally, the testimony was not that plaintiff was told she needed to act immediately "in order to profit from the lots offered by defendant," but rather that she must quickly purchase the property. Further, the need for a quick purchase is mere puffery, and not a material misrepresentation.

To prevail on a claim for fraudulent misrepresentation as to the first and second statements, the plaintiff must show that the representor knew the statement was false. The evidence shows that Land Investors set the sales price, knew the original purchase price of the lots, and knew the market value of the lots. The evidence satisfies the Court that Giger knew the projected gains would never be realized within the time period promised.

Aznavourian and Zimmer induced the purchase of the lots by stating that the value of the lots would double or triple within three years and that the lots were a much better investment than the rental income property plaintiff sought. Based on Aznavourian and Zimmer's familiarity with the Port Charlotte Subdivision, the actual value of the lots, and the uncertainty of the market caused by the sub-prime crisis, Aznavourian and Zimmer knew or should have known that the representations were false. Furthermore, it is clear that statements were made with the intent of inducing the purchase of the lots and that Mendez relied on the

misrepresentations.  Therefore, the Court finds that plaintiff has established a claim for fraudulent misrepresentation.[6]

Claims for negligent misrepresentation and false information negligently supplied require the recipient to justifiably rely on the erroneous information.  Justifiable reliance does not require the recipient of information to investigate every piece of information furnished, however, the recipient is responsible for "investigating information that a reasonable person in the position of the recipient would be expected to investigate."  Gilchrist Timber Co., 696 So. 2d at 339.

Based on the competent evidence, the Court finds that Mendez acted in justifiable reliance upon the first two statements in her decisions to purchase the lots.  Mendez, interested in acquiring property abroad, contacted an investment agency and was put in contact with Zimmer.  Zimmer told Mendez that rental property would not be a good investment and presented what he claimed to be a better alternative.  Mendez stated that she was shown satellite

---

[6]Accompanying plaintiff's claim for fraudulent misrepresentation is a request for punitive damages. "Punitive damages are limited to truly culpable behavior and should not be awarded unless the defendant 'acted with malice, gross negligence or oppression.'" Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc., 921 So. 2d 43, 47-48 (Fla. 3d DCA 2006) (quoting Capital Bank v. MVB, Inc., 644 So. 2d 515, 521 (Fla. 3d DCA 1994).  The standard jury instructions on punitive damages provide that an award of punitive damages is discretionary. In re Standard Jury Instructions In Civil Cases-Report No. 09-01 (Reorganization of the Civil Jury Instructions, 35 So. 3d 666, 791 (Fla. 2010).  Here, the Court finds that the circumstances do not warrant an award of punitive damages; therefore, plaintiff's request is denied.

-34-

images of the lots and charts and materials which projected guaranteed double and triple returns. Similar representations were made by Aznavourian and confirmed by Astouric. Furthermore, Mendez had her attorney confirm the existence of the lots before completing the first transaction. Although further investigation may have been prudent, further diligence is not required. Because the misrepresentations came from seemingly credible sources and an investigation into the lots' existence was conducted, the Court concludes that a reasonable person would not be expected to conduct a more extensive investigation under similar circumstances. Accordingly, Mendez's reliance on the misrepresentations was justified.

Finally, plaintiff's justifiable reliance on the misrepresentations resulted in damages. Mendez purchased the lots under the belief that it was a better investment than rental income property and that she was guaranteed to double or triple her investment, but the circumstances made such a result unlikely, if not impossible.[7] Because a substantial sum was paid for property that did not have the investment potential guaranteed, plaintiff has suffered damages.

---

[7]Based on the stipulated information set forth in the chart on page 5, Land Investors purchased the ten lots for roughly $73,000. In order for Mendez's investment of $255,000 to double, the value of the lots would have to increase by approximately 700%.

Based on the evidence, plaintiff has met the burden of proof on her claims for fraudulent misrepresentation, negligent misrepresentation, and false information negligently supplied. Plaintiff, however, is not entitled to additional monetary relief because the relief granted in Count I is sufficient to compensate plaintiff for any loss sustained as a result of the misrepresentations.

Accordingly, it is now

**ORDERED AND ADJUDGED:**

1. The Clerk shall enter judgment as to Florence Mendez's Complaint (Doc. #1) as follows:

A. As to Count I, in favor of Florence Mendez and against Land Investors, Corp. in the amount of $255,288.00, plus pre-judgment interest in the amount of $41,839.26, totaling $297,124.26, provided that Mendez re-conveys clear title to the ten lots back to Land Investors;

B. As to Count II, in favor of Florence Mendez and against Land Investors, Corp., who shall take the same monetary damages as set forth for Count I;

C. As to Count III, in favor of Florence Mendez and against Land Investors, Corp., who shall take the same monetary damages as set forth for Count I; and

D.   As to Count IV, in favor of Florence Mendez and against Land Investors, Corp., who shall take the same monetary damages as set forth for Count I.

2.   The Clerk is further directed to terminate all remaining deadlines and to close the file.

3.   Plaintiff may file a motion for attorney's fees and costs, with supporting memorandum and documents, within **FOURTEEN (14) DAYS** of the entry of the judgment as provided by M.D. Fla. R. 4.18(a).

**DONE AND ORDERED** at Fort Myers, Florida, this __8th__ day of January, 2014.


_____
JOHN E. STEELE
UNITED STATES DISTRICT JUDGE


Copies:

Counsel of record

-37-